UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Crim. No. 19-10333-DPW |
| v. | ) | |
| | ) | |
| HILDEGAR CAMARA, | ) | |
| | ) | |
| Defendant | ) | |

GOVERNMENT'S MOTION FOR A DOWNWARD DEPARTURE PURSUANT TO
U.S.S.G. § 5K1.1 AND MEMORANDUM IN SUPPORT

Pursuant to Section 5Kl.l of the United States Sentencing Guidelines ("USSG"), the United States of America, through undersigned counsel, hereby moves the Court to downwardly depart when it sentences defendant Hildegar Camara (hereinafter, "the defendant" or "Camara") on July 21, 2021.   The government certifies that the defendant has provided substantial assistance in the prosecution of former Fall River Mayor Jasiel F. Correia, II (hereinafter, "Correia").   Camara's trial testimony regarding the extortions of David Brayton and Brian Bairos, particularly with respect to Correia's inculpatory statements to Camara, was critical evidence in that case, no doubt instrumental in the jury's verdict convicting Correia.

Accordingly, for the reasons set forth below, the government recommends that the Court downwardly depart and sentence Camara to three months' incarceration, to be followed by 21 months of supervised release, with a special condition of 150 hours of community service in Fall River, no fine (based on what the government understands is the defendant's inability to pay), and a $600 mandatory special assessment.

I.    Advisory Sentencing Guidelines

At pages 2-3 of the plea agreement in this case, ECF Dkt. No. 2, the parties calculated the defendant's Total Offense Level ("TOL") as 25, corresponding to a Guidelines Sentencing

Range ("GSR") of 57-71 months.  Although the path to its calculation differed slightly from the parties, Probation has also calculated the defendant's TOL as 25, corresponding to a GSR of 57-71 months.  *See* Final PSR at ¶¶ 34-60.  The government does not object to Probation's calculation.

It should be noted that the TOL that Probation calculated for Camara is two points lower than the TOL of 27 that Probation calculated for Camara's co-conspirator, Antonio Costa (hereinafter, "Costa").  The two-point difference in TOL between Costa and Camara essentially stems from the amount of the Brayton bribe that was foreseeable to each co-conspirator.  *See* Final PSR at ¶¶ 40-41.[1]

II.    Camara's Role in the Offenses to Which He Pled Guilty and Relevant Conduct

Having presided over the trial of Correia, the Court is obviously well-aware of the defendant's role in the offenses of conviction.  In short, Camara conspired with Costa and Correia to extort Brayton and Bairos for cash and other things of value in return for non-opposition letters.  In contrast to co-conspirators Correia and Costa, however, Camara did not profit in return for his role in the Brayton and Bairos extortions.

In addition to the four extortion-related counts to which Camara pled guilty, he also pled guilty to two false statement counts related to his role in the Brayton and Bairos extortions.  *See* 5/4/21 Correia Trial Tr. at 173-174.

Finally, while Camara was never charged with any crime related to the Batman Rolex counts, and the jury acquitted Correia of these counts in any event, Camara testified at trial that

---

[1] Camara's base offense level of 14 is two levels higher than Costa's because Camara was a public official at the time of the offense, *see* Final PSR at ¶ 38.  Because, however, only $100,000 of the $250,000 bribe was foreseeable to Camara, his base offense level is increased by 8, whereas Costa's base offense level was increased by 12.

he delivered the watch to Correia on behalf of Costa and had some general knowledge that it related to a building Costa owned.[2]

III.   Camara's Substantial Assistance

Camara's cooperation in this matter was both substantial and essential to the government's case against Correia.  Although Camara initially made false statements to federal investigators regarding his role in Correia's corruption, once he accepted responsibility and decided to cooperate with the government, his efforts were exemplary.  Camara met with the government on approximately eight to ten separate occasions in connection with his cooperation.[3]   Many of these sessions lasted several hours, as the government attempted to reconstruct the timeline of corruption from several years earlier without any meaningful records. It was abundantly clear to the government during these sessions that Camara's crimes and subsequent decision to cooperate in this case have taken a significant toll on him – financially, medically, and otherwise.

Ultimately, Camara's testimony at trial, particularly with respect to private conversations between him and Correia in which Correia made damning admissions, was crucial evidence.  It was crucial evidence not just because it directly inculpated Correia, but because it corroborated Costa, the witness who put the money directly into Correia's hands, as well as several other witnesses, including Brayton, Bairos, Matt Pichette, and Charles Saliby.  Like Costa, Camara

---

[2] As the government noted at Costa's sentencing hearing in response to the Court's question regarding the Batman Rolex counts, the jury's acquittal appears more likely to have stemmed from legal deficiencies in those counts related to the timing of the gift, *see United States v. Correia*, 18-10364-DPW, ECF Dkt. No. 230-1, rather than a rejection of Costa's and Camara's testimony.

[3] As the defendant pointed out in his own sentencing memorandum, Camara also testified in the grand jury in connection with the SnoOwl portion of this case prior to cooperating with the government.  *See* Defendant's Sentencing Memorandum, ECF Dkt. No. 42, at 6.

was subjected to "very effective … cross examination with all of the shame that brings …" *See* 6/29/21 Costa Sentencing Tr. at 8.  Given the close family relationship between Camara and Correia, the shame and isolation stemming from Camara's cooperation in this case has undoubtedly been acute.

In short, while it is true that Camara's cooperation did not break open the corruption case in the way that Costa's did, had Camara chosen not to cooperate, what this Court has referred to as the "exceptionally important" case against Fall River's corrupt former mayor would have been considerably more challenging to prove, and could well have come out differently.

IV.   Sentencing Recommendation

As it attempted to do with respect to Costa, the government arrived at its sentencing recommendation in this case after much deliberation and consideration of all of the factors set forth in 18 U.S.C. § 3553, including the nature and circumstances of the offenses, the defendant's background (more fully discussed in the PSR and the Defendant's Sentencing Memo, ECF Dkt. No. 42, at 3-4),[4] the need to promote respect for the rule of law, and specific and general deterrence.  Given how similarly situated Camara and Costa are, the government has also spent considerable time contemplating its recommendation for Camara vis-à-vis its recommendation for Costa, and in light of this Court's comments at recent hearings in related matters.

In many ways, Camara compares favorably to Costa.  First, Costa was more culpable than Camara in the offenses of conviction in that, among other things, Costa profited considerably from his crimes and was more extensively involved in the illegal activity.  Second,

---

[4] It bears noting that, while obviously not identical, many of Camara's personal and family circumstances – particularly his immigrant background and family responsibilities – are comparable to Costa's.

while Camara has accepted full responsibility for what he did, the evidence in this case was that Camara was uncomfortable with the underlying corruption almost immediately in a way that was not as apparent with respect to Costa.  *See, e.g.*, 6/29/21 Costa Sentencing Tr. at 6 (in discussing general deterrence, this Court refers to "the almost comic way [] Camara dealt with the potential for fed involvement in this case").  Finally, unlike Costa, who admitted to illegally dealing marijuana for a long period of time, and tax and money laundering offenses connected thereto, Camara has no comparable criminal history.

In the government's view, Camara compares unfavorably to Costa in that Camara was in a position of public trust.  And, as valuable as Camara's cooperation was, the reality is that Camara was not "the first person in the door [] who is going to get the best treatment."  *See* 6/29/21 Costa Sentencing Tr. at 7.

As was true with Costa, the crimes committed by Camara were serious and significantly harmed the government and citizens of Fall River.  Those crimes deserve punishment.  However, the nature and seriousness of the defendant's crimes must be balanced against the value of his cooperation, the overwhelming public interest in exposing and convicting corrupt elected officials like Correia, and the law-abiding and productive life Camara led prior to his involvement in this case.

As this Court well knows, federal criminal corruption cases are notoriously difficult to make and to prove.  Such cases require the cooperation of individuals like Costa **and** Camara.  As such, it is critically important to incentivize cooperation like Camara's by imposing a sentence that reflects the true value of that cooperation and that is considerably below what the defendant would be facing absent the cooperation.  It is equally important for this Court's sentence to send a message that encourages individuals with inculpatory information against

corrupt elected officials to cooperate, especially those facing their own criminal exposure. Indeed, as this Court noted at Costa's sentencing, "That's part of deterrence, too. That's part of saying to those who are involved in this sort of thing, 'You did the right thing, and you're going to get a special benefit.'"  *See* 6/29/21 Costa Sentencing Tr. at 7.

Camara proffered truthfully, testified truthfully at trial, and was subject to very effective cross-examination.  As this Court noted with respect to Costa, "that process … has had the effect of ostracizing him in the community."  *See id*.

To meaningfully distinguish Costa's cooperation from Camara's cooperation, while also accounting for the numerous above-described ways in which Camara compares favorably to Costa, the government's recommendation here includes three months of incarceration.  In addition, the government's recommendation includes 150 hours of community service to enable the defendant to continue to make amends for the harms he caused the city of Fall River. Because Camara did not profit from his offenses, the government is not recommending forfeiture. Moreover, due to the strained financial circumstances delineated in the PSR, and communicated by defense counsel to the government, the government is not recommending a fine.

Accordingly, for all the reasons set forth herein, the government moves for a significant downward departure and recommends that the Court sentence Camara to three months of incarceration, followed by 21 months of supervised release, 150 hours of community service in Fall River, no fine, and a $600 mandatory special assessment.  Pursuant to 18 U.S.C. § 3553, such a sentence is sufficient, but not greater than necessary.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By:     /s/ Zachary R. Hafer
ZACHARY R. HAFER
DAVID G. TOBIN
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

/s/ Zachary R. Hafer
Zachary R. Hafer
Assistant U.S. Attorney

Date:   July 15, 2021